TURKEY, J.
delivered the opinion of the court.
The prisoner, James N. Stone, was indicted, tried and con- *31 vic-led for ibe murder of John B. Mitchell, at the June term of the Obion circuit court, 1842; and upon the recommendation of the jury, sentenced by the court to confinement in the jail and penitentiary of the state during his natural life. The testimony as to the guilt of the prisoner is voluminous; and in the investigation of it, all the court can do will be so to examine it as to show that the jury have not acted with any degree of rashness in finding their verdict; but were warranted by the circumstances proven in coming to the conclusion they did.* There is much of it immaterial to the result, and a minute examination of which would, swell this opinion to an unnecessary extent. . It appears from the testimony of John E. Prinn, that the deceased was hilled in his own house, in Obion county, on the night of.the 3d of October, 1841, a little after dark, being shot with two bullets, through a small crack in the house. It further appears with sufficient certainty, that as early as three or four years before the trial, Stone and Mitchell had quarrelled, and that Stone had threatened to kill him; that this difficulty had been settled between them in Dec. 1839, of Jan. 1840, and that they had been friendly from that time until about'the month of June, 1841; that about that time one Artimesia Owens, of whom prisoner had been guardian, married one Graham, who sold to the deceased a tract of land upon which the prisoner as guardian had settled, called the Ferry place; and that when prisoner heard of it, he became angry with deceased, and said he hoped the place might never do him any good; and that if he could help it, it never should; that deceased sued prisoner for the premises, but that upon the trial they again made up their quarrel and continued apparently friendly until the house of the deceased was fired, which event took place on the fifth day of Sept. 1841, and that the prisoner was accused of having been the perpetrator of that offence; that the prisoner lived unhappily with his wife, and occasionally treated her so badly as to force her to the house of the deceased for protection; that she had done so on the night his house was fired, and that she was living then with him;' that *32 the prisoner left the neighborhood on the 8th of September, 1841, and on the 11th passed down the river Mississippi in a steamboat by the house of the deceased; that one week before the murder of the deceased, the steañíboat Pensacola stopped, on her passage up the river, about two miles above the house of the deceased, and sent her yawl ashore; that no person lived at the point. ' These facts appear from the testimony of Frederick Brown, a stepson of the .prisoner, aged about sixteen years. This testimony is indirectly attacked, but we think not sufficiently so. to impeach it. It further appears, from the testimony of Franklin Longley, the brother-in-law of the prisoner, that Mitchell had threatened Stone; that witness was at Mitchell’s house the morning of the murder; that he was acquainted with prisoner’s foot tracks; that he wore a pair of boots that were broader across the ball of the foot than is usual; that he examined the foot prints through the field of the deceased; that the tracks led from the house and seemed to be made by a person running; that he believed the tracks were those of the deceased, but does not know whether they were made by a shoe or a boot.
John M. Kimberly proves, that he saw the steamboat Pensacola put out a man in a yawl about two miles from the residence of the deceased; that he was a man of ordinary size, but could not tell who it was, not being near enough to distinguish him.
James Good proves, that the steamboat Pensacola stopped about two miles from the residence of the deceased and sent her yawl ashore, but does not know that any person was landed.
R. E. Graham proves, that he is brother-in-law, by marriage, to the prisoner; that he saw the steamboat Pensacola stop and put out á man about two and a half miles from the house of the deceased; that the next day he saw a track which he supposed to be the passenger’s; believes it to have been the prisoner’s; that he saw the tracks leading from the house of the deceased the morning after the murder, and believed them to be the tracks of the prisoner, the same he had seen on the river, and that deceased was killed on the first night after he moved into the house about which he and prisoner had had the difficulty.
*33 Daniel Moses proves, that about a week before the murder, he saw in the neighborhood of the deceased an individual that he took to be a negro woman with a gun on her shoulder; that ihe person turned out of the road about one hundred yards from him; that he was alarmed and could not tell whether it was a while man or negro.
Earle S. Thayer proves, that on the Sunday before that on' which the deceased was murdered he saw the steamboat Pensacola stop and put out a man about two and a half miles from his house; that early on next morning he went out to hunt and saw the prisoner in the road three fourths of a mile from the house of the deceased; that he had a gun, and seemed not inclined to stop and talk; that he knows prisoner well, and is certain it was him.
Archibald Crocket proves, that he captured the prisoner at Memphis, and whilst he was in custody he conversed with him about the murder, and that the prisoner informed him that he had not been in the county of Obion since the 8th of September, 1841; that when he left the county he went to Mills’s Point and took passage on a steamboat for New-Orleans; that he returned on the steamboat Pensacola to one Fletcher’s, about fifty miles below the residence of the deceased, and from thence went back to Memphis.
A. M. Pool proves, that on the 7th of September he saw prisoner, and told him that the deceased suspected him of having fired his house; advised him to leave the country; that prisoner observed he had been badly treated; that he did not like to go away; that if he could kill one or two of the leaders of them, he would be willing to go away or die; that they were then speaking of prisoner’s difficulty with his wife and the deceased.
James R. Parmenter proves, that he saw the tracks at the house of the deceased about two days after the murder; is satisfied they were the tracks of the prisoner.
Listeni'S. Cashon proves, that he saw the tracks at the house of the deceased and believes them to have been the prisoner’s.
The testimony of James L. Clasher, that he heard the report of the gun; that he knew it to be that of the prisoner, and *34 observed that he had killed the deceased — is of too doubtful character to have any weight in this examination.
J. Newton proves, that after the house of the deceased had been fired he advised prisoner to leave'the country; told him that deceased would kill him; to which prisoner replied, he could shoot as well as him, and he would not go away unless he had satisfaction, and that if he did go he would leave a “big stink” behind him; saw the tracks at the house of the deceased the morning after the murder, and believes them to be prisoner’s.
This is the material part of the proof upon the corpus delicti, as extracted from the rude and confused mass of proof in the bill of exceptions. What does it prove? That the deceased was killed on the night of the 3d of October, 1841; that the prisoner and he had had angry difficulties from a period long anterior up to the time of the commission of the offence; that they resulted from mutual wrongs done and charged; the prisoner accusing the deceased of having harbored his wife, to his great personal injury, and the deceased accusing him of having fired his house; that on the 11th day of September, 1841, not many days before the murder, the prisoner left the country in a steamboat, with threats in his mouth of vengeance for his injuries, which he declared he would have before he left; that one week before the murder he returned in the steamboat Pensacola, and kept .himself so concealed that but one person saw him certainly; others saw what they took to be his tracks; and one, a person in disguise which he supposes might have been him: that on the night the deceased took possession of the building which had formed the subject of the controversy between them, he was killed, cowardly and treacherously; that the prisoner immediately fled the country again, and being captured at Memphis, denied that he had been in the county of Obion since his first departure on the 11th of September, but admitted that he had returned up the river in the steamboat Pensacola to within fifty miles of the residence of the deceased. Who upon this can doubt of his guilt? It is proven satisfactorily, that the steamboat Pensacola landed a man within some *35 two miles of the residence of the deceased: prisoner admits he retured in the boat, and one person at least saw him within three fourths of a mile of the residence of the deceased a few days before the murder. If the prisoner were innocent, why the necessity of his false statement about his return? and if his statement were not false, why did he not take proof of the person at the place where he alledges he stopped, some fifty miles below, to prove this fact! It is not so. And so far from considering that the jury acted with any degree of rashness, we are satisfied ourselves of the prisoner’s guilt. But this is not all we have to examine in this case. There are several other propositions which have to be discussed before we can affirm this judgment. And first, there is much proof in the record tending to show that the prisoner was guilty of the offence of firing the house of the deceased; and it is now objected, that this being a substantive felony, the proof going to establish it was illegal. And of this there can be no doubt, upon well settled principles. But it is to be observed, in answer to the objection: 1st, that it is difficult to ascertain from the proof as reported, whether it was not brought out as much by the counsel for the defence as for the prosecution: and, 2d, that the proof was not objected to on its introduction or on the argument of the case; and that proof, that the deceased had accused the prisoner of the offence, was legitimate, for the purpose of showing cause of malicious feeling. And the extension of proof so far as to establish guilt, not being objected to, cannot, upon any principle of legal administration of justice, be regarded as error. If it had been objected to, it might not have been pressed; and if pressed, might have been excluded by the court. It will never do to permit a prisoner to hear illegal testimony, and then assign it as error, after having heard it admitted without objection; for advantage will always be taken of an indiscreet prosecution by such permission. And so, this court, held at Jackson in 1834, in the case of Murrell v. the State. The case of Peek v. the State, 2 Humphreys, 78, cited for the contrary position, is not in point, but upon a different subject altogether, as is obvious upon its inspection. 2d. There is proof, that the prisoner maltreated his wife, and forced her to abandon his *36 house and seek refuge under the protection of the deceased; which was objected to, and, it is argued, ought to have been excluded for the reason assigned' in the question of arson, contained -in the -'first objection. We do not think so. The protection afforded by the deceased (to say the least of it, under questionable circumstances,) was a most aggravating offence to the prisoner, and therefore exceedingly proper proof of malice prepense on his part; and the incidental abuse accompanying, and perhaps inducing the flight of the wife, is not such proof upon a separate criminal charge as vitiates the verdict; but whatever of misdemeanor may have existed in the abuse of the wife is entirely merged in the offence of the criminal protection on the part of the deceased, and could not in any event be considered as proof upon an offence not charged. 3d. There are several objections arising out of misconduct on. the part of the jury, and of improper guardianship over them during their deliberations upon the case. These two questions arise out of affidavits filed for a new trial, which will have to be examined and their merits tested upon legal principles. The first affidavit relied on, is that of John A. Gardner, J. G. Harris, R. P. Rains and J. Leigh, who swore that the following irregularities were committed’by the jury during the trial, as they are informed and believe: They saw a juror named Mills whispering with John C. Outlaw, and that they are informed'and believe that the substance of that conversation has not been correctly stated to the court; that they are informed and believe that one night since the commencement of the trial the jury was left alone in their room, whilst the officer sworn to attend them visited a distant portion of the town; that they are informed and believe, that ardent spirits in considerable quantities were used by some of the jury during the trial; that they are informed and believe that the whole jury were seen in a public bar room, surrounded by a crowd, a night or two; -and while they were charged with the case; that one juror actually slept in open court during the examination of the testimony; that upon the information of one of the jurors, (Elisha Parker,-) they believe a part of the jury separated from the remainder several times at night during the trial of the cause; that said Parker promised to fur *37 nish an affidavit of the fact, but that he and the rest of the jury, upon consultation, refused to communicate any thing in regard thereto; that they heard another juror, name not known, in conversation with a third person after their discharge, and the juror asked, in a suppressed tone, if any advantage could betaken of a separation of the jury for a short time, when such separation was rendered necessary by nature. Upon this affidavit the court was asked that the jurymen might be compelled to come into court and testify as to the facts complained of. The least that can be observed of this affidavit is, that it deals in generalities; is supported by information and belief, and not by facts sustained by oath, with the exception of the charges that one of the jury slept during a portion of the trial and that another was seen to whisper to a stranger, and therefore this affidavit cannot be received as establishing any facts save these two. What the juror said, not being on oath, must rest in hearsay and may be untrue. A new trial never has been, and it may safely be predicted never will be granted upon the reported observations of jurors as to their conduct during the trial. This question is settled by repeated adjudications of this state, and has always been upon the question of how far they might impeach their verdict by their own oaths. If hearsay evidence of misconduct in jurors might be received to set aside a verdict, verdicts would indeed be worth but little. The only questions then left upon this affidavit, as affecting the motion for a new trial, are, 1st, whether one juror being seen whispering to a third person, and another being seen asleep for an unascertained period of time, are good causes for a new trial. Upon the first it is to be observed, that the bill of exceptions in the case shows that the whispering complained of took place in open court; and that it was impossible, from the facts stated, that the juror could have been tampered with, as the subject of conversation is satisfactorily shown to have been relative to the health of the juror’s family. This bill of exceptions also shows two other causes which are assigned for a new trial: 1st, that the jury drank ardent spirits at their meals during the progress of the trial; and, 2d, that the sheriff, who was not the sworn officer of the jury, had charge of them at a period *38 of time when the constable was absent, but that he said nothing to them about the trial. A great deal, first and last, has been said about the beauty and purity of trials by jury, and with truth; and our ancestors were so jealous of its preservation, that many absurd practices relative thereto were introduced into the courts, which, like many other abuses, retained possession of them for a long time: among the rest, the practice of not allowing jurors meat and drink until their verdict was returned. But these restrictive principles have been broken down in most of the states of this Union, and even in England; and the purity of jury trials made to depend not upon form, but substance. That they have still been preserved in this state and New-York to the extent shown in the case of Brant v. Fowler, 7 Cowan’s Rep. 562, is more a matter of amusement than serious reflection. To show how the law has been held in this state upon questions of this character, we will refer to the opinion delivered in the case of McLean v. the State, 10 Yerger, 241, where it is held “that the person accused may have the full benefit of a judgment of his peers, it is absolutely necessary that the minds of the jurors should not have prejudged his case, that no impression should be made, except what is drawn from the testimony given in court, to operate on them; and that to secure this, they must not be permitted to separate and mingle with the balance of the community without explanation, showing that they had not been tampered with, and that it was not necessary for the prisoner to prove tbat they had not been.” The same principle will apply to eating and drinking. A fair and unbiassed expression of opinion is what is required; and any little misconduct, which is shown could not have been attended by bad consequences, will not vitiate a verdict. In this case, the trial was conducted under the inspection of a judge; if eating and drinking or sleeping had disqualified the jury, or a portion of them, from considering the case properly, it would have been his duty to have awarded a venire facias de novo. That he did not do so, we must, in the absence of proof, .come to the contrary conclusion, and hold that these slight irregularities complained of were entirely innoxious to the prisoner. As to the separation of the jury, complained of, and the introduction *39 of the sheriff into their room, all that is necessary to observe', in view of the principles just laid down, is, that it is shown satisfactorily to our minds, that whatever little separation took place, was casual, and of no importance, and that there was no tampering, or opportunity of tampering, furnished by it, and that the sheriff expressly swears that he did not speak to the jury about the case. There are several other affidavits, which do not vary these principles in any material point; and to examine them' minutely, would swell this already long opinion to a very unreasonable extent.
Upon the whole, we are fully satisfied with the judgment of the court below, and affirm it.

 Danes v. the State, 2 Humphreys; Kirbey v. the State, 3 Humphreys.